GARRETT, J.
| ¡The defendant, Roderick Crossley, was convicted as charged of two counts of second degree murder in violation of La. R.S. 14:30.1, following a two-and-one-half-week jury trial. The trial court sentenced him to serve concurrent terms of life imprisonment without benefit of parole, probation or suspension of sentence. We affirm the defendant’s convictions and sentences.
FACTS
Shortly after midnight on September 23, 2007, Tracy Edmonds and her boyfriend, Clinton Long, were shot in their home in Bastrop, Louisiana, by an intruder. Ms. Edmonds, who was in her bedroom, was shot two times and died immediately. Mr. Long was shot three times and died shortly thereafter at the hospital.
Three of Ms. Edmonds’ children — Con-travious (age 15), Roshonda (age 12), and a four-year-old son — were home at the time of the murders. The children, who shared a bedroom, were awakened by the gunshots. Mr. Long ran through the house, shouting that the man had a gun and to “get down.” The older boy grabbed his little brother, ran to the couch in the living room and lay on top of the child to protect him. Roshonda fled to the kitchen. The shooter bolted from the house after shooting Mr. Long. Contravious told his sister to lock the front door, which she did, and he went into their mother’s bedroom and called 911. After Contravious came out of the bedroom, he would not allow his younger siblings to go in to see their mother because he knew she was dead. Within minutes of the shootings, |2Roshonda told Contravious that she recognized the shooter as the defendant, their mother’s former boyfriend.
Roshonda told the police that the defendant was the shooter. The police showed her a driver’s license photo of the defendant to confirm that he was the same Roderick Crossley she named. Based *590 upon Roshonda’s identification, the police began to search for the defendant. When they found him several hours later at the home of his girlfriend, Ellatrice Tyler, he was sitting on the commode and wearing boxer shorts. He was taken into custody and read his Miranda rights. He was allowed to wash his hands and get dressed before he was taken to the police station.
At the police station, the defendant was read his Miranda rights again and he signed a waiver form. When advised that there were witnesses to the murders, he responded, “Kids will lie.” However, none of the officers had mentioned that the witnesses were children. The defendant then asked if the police had a gun; notably, no reference had been made to the defendant by the officers about the manner in which the victims were killed. Because he had washed his hands earlier, the police did not attempt to test his hands for gunshot residue (“GSR”).
A search of Ms. Tyler’s house later in the day led to the recovery of a black trash bag containing clothes the defendant had worn the night of the murders. Testing determined that there was GSR on these clothes. Approximately one week after the killings, the murder weapon — which was wrapped in a pillowcase — was recovered at the home of one of Ms. Tyler’s relatives.
|3In October 2007, the defendant was indicted on two counts of first degree murder. The bill was later amended to charge two counts of second degree murder. The defendant initially pled not guilty and later changed his plea to not guilty and not guilty by reason of insanity.
In March 2008, the trial court appointed a sanity commission to assess the defendant’s mental condition pursuant to a motion filed by the defense questioning the defendant’s mental capacity. The defendant was evaluated by two psychiatrists, Dr. Richard Williams and Dr. Travis Phi-fer. Although Dr. Williams believed that the defendant was malingering and attempting to act in a “profoundly mentally retarded fashion,” he ultimately concluded that the defendant was unable to consult with his attorney. Dr. Phifer found that the defendant was mentally retarded and unable to assist his defense. Based upon these evaluations, the trial court found in June 2008 that the defendant was incompetent to stand trial and, following Dr. Williams’ recommendation, placed him under the care of the Eastern Louisiana Mental Health Systems, Forensic Division (“ELMHS”). Following treatment, the defendant was eventually determined to be able to assist in his defense and was released back to the Morehouse jail authorities in November 2009. At a hearing held on December 29, 2009, the defendant was found competent to stand trial. The defense did not object to this ruling and the case proceeded forward.
In March 2011, the trial court ordered an evaluation of whether the defendant was able to distinguish right from wrong at the time of the offenses. Drs. Williams and Phifer reevaluated the defendant and concluded 14that he knew right from wrong at the time of the murders. They also concluded he was competent to proceed.[1]
Jury trial commenced in February 2012. The defense zealously argued to the jury that the man who killed Ms. Edmonds and Mr. Long was actually Jerome McHenry, an abusive former boyfriend of Ms. Ed-monds who resembled the defendant and was of the same short stature. However, *591 the defendant was found guilty as charged on both counts of second degree murder. In August 2012, the defendant’s motions for new trial and post verdict judgment of acquittal were denied. The defendant was sentenced to two mandatory terms of life in prison without benefit of parole, probation or suspension of sentence. The trial court ordered that the sentences run concurrently.
This appeal followed. Defense counsel asserted five assignments of error. In a pro se brief, the defendant raised some of the same issues contained in his counsel’s brief and urged some additional issues.
SUFFICIENCY OF EVIDENCE
In his first assignment of error, the defendant argues that the evidence presented at trial was not sufficient to prove that he killed the victims.
Legal Principles
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La. App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable Ldoubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In cases where the defendant asserts that he was not the person who *592 committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentifieation in order to carry its burden of proof. State v. Johnson, 38,927 (La.App.2d Cir.11/23/04), 887 So.2d 751; State v. Jefferson, 47,009 (La.App.2d Cir.3/7/12), 91 So.3d 1007, writ denied, 2012-0751 (La.11/2/12), 99 So.3d 661. Credibility determinations are the province of the trier of fact. State v. Johnson, supra. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support the requisite factual conclusion. State v. Johnson, supra.
17Evidence
Roshonda Edmonds, Ms. Edmonds’ daughter, was 17 years old at the time of the trial. She was unwavering in her identification of the defendant as the man she saw shoot Mr. Long. She testified that the shooter was only five to six steps from her and that she observed him straight on, not in profile. Within moments of seeing the shooter, she told her older brother that it was the defendant. She repeated her identification to the police when she gave a statement to them shortly after the murders. When the police showed her a photo of the defendant, she affirmed that he was the man she saw. She also said that the defendant was wearing long pants at the time of the murder. At trial, she testified that she was familiar with the defendant because he had dated her mother. She testified that she also knew Mr. McHenry, who had dated her mother after the defendant did, and that he was not the man who shot Mr. Long.
Roshonda’s older brother, Contravious, testified that he thought that if the defendant was the shooter, he “would have known it.” He also believed that the shooter might have been wearing blue jeans. However, Contravious testified that after hearing the first shots and after Mr. Long shouted warnings, he grabbed his four-year-old brother, put the child on the sofa and lay on top of him to shield him from harm. Thus, his attention was concentrated on his little brother, not the shooter. Contravious testified that his sister fled to the kitchen and that the only lights on in the house were in the kitchen and his mother’s bedroom. He said that Roshonda told him that she recognized the shooter as the defendant within minutes of the incident, |sthat she never wavered in her identification, and that he did not think that she was lying.
Amberschelle Hampton, the defendant’s teenage daughter, testified that the defendant and his girlfriend, Ellatrice Tyler, picked her up in a black SUV at about 10:30 p.m. on the night of the murders. When they stopped at the home of a Crossley relative, her father told Ms. Tyler to give him a gun which was in the glove compartment. Ms. Tyler complied. The defendant, who was wearing jogging pants and a red shirt, then instructed them to come back and pick him up around midnight or 12:30. The women did as instructed, returning at about midnight. The defendant returned at 12:40, running and out of breath. He changed clothes, placing the clothes he had been wearing in a plastic trash bag. Amberschelle did not recall seeing the gun at this time. After they returned to Ms. Tyler’s house, the defendant told Amberschelle to “keep his name alive.” Thereafter, he was arrested for the Edmonds/Long murders. Ms. Tyler instructed the girl to tell the police that Ms. Tyler had been with her all day.[2]
*593 When shown a photo of the murder weapon, Amberschelle testified that it looked like the black gun her father had that night. She identified the pillowcase in which the gun was recovered as looking like one she had seen in the back of the SUV that night. She also identified the black trash bag and the clothes therein recovered by the police at Ms. Tyler’s house as the items she saw the night of the murders.
|9Police officers testified about the circumstances surrounding the defendant’s arrest. After Ms. Edmonds’ daughter identified the defendant as the shooter, they immediately began to search for him. The first time they went to Ms. Tyler’s house, they did not find him there. When they returned a few hours later at about 5:00 a.m., they searched the house with Ms. Tyler’s permission and discovered the defendant in the bathroom. Because he had been using the toilet, a detective allowed him to wash his hands. The defendant was transported to the police station where he signed a rights waiver form. While the officers told him why he was arrested and that they had witnesses against him, they did not tell him that the witnesses were children or that the victims were shot. Nonetheless, the defendant made incriminating statements that “kids will lie” and asked if they had a gun. When asked his whereabouts at the time of the murders, the defendant indicated that he had been “walking around.”
The police returned to Ms. Tyler’s house a third time at about 7:00 a.m. She again gave them permission to search the house. This time they retrieved a black trash bag containing the defendant’s clothes from the night before. Forensic examination of the clothes revealed GSR on a pair of black pants, a red shirt, and a white t-shirt; no GSR was found on a blue shirt and a pair of white socks found in the same bag. A week later, the police recovered the murder weapon. It was found in a pillowcase at the home of a relative of Ms. Tyler. This residence was located two to three miles from the crime scene. Forensic examination matched bullets recovered from Ms. Edmonds’ body and the shell casings found at the crime scene to the gun.
| )0The officers also testified that in the early hours of September 23, 2007, between 1:00 a.m. and 8:00 a.m., a call was received on the police station landline from a woman who identified herself as “Shani-sha Smith.” The call was placed from an untraceable, prepaid TracFone. The caller suggested that Jerome McHenry might be a suspect in the murders. At about 3:30 a.m., Mr. McHenry came to the police station of his own volition and told officers that he had heard what happened and that he might be a suspect in a murder case. Unaware that Mr. Long had been shot and killed, Mr. McHenry suggested that Mr. Long should be considered a suspect. According to the officers, Mr. McHenry was completely cooperative and was released. Although a swab was taken to test Mr. McHenry’s hands for GSR, the swab was misplaced by the police and never sent for testing.
The defense called Mr. McHenry as a witness. He testified that he dated Ms. Edmonds two or three years before her death. He admitted having a criminal history which included a 2010 conviction for attempted aggravated battery. He also admitted his involvement in two violent incidents involving Ms. Edmonds — in June 2006, he threw a brick through a window *594 at her house, and in July 2006, she was injured when she tried to break up a fight between him and another man. He conceded that she obtained a restraining order against him. However, he said he had moved on from the relationship and had a baby with someone else prior to Ms. Ed-monds’ murder. He disavowed being the father of any of Ms. Edmonds’ children.
_LQMr. McHenry denied involvement in the shooting deaths of Ms. Edmonds and Mr. Long. He testified that he was at a relative’s house for a party from 11:00 a.m. on September 22 until well into the night. When he heard what happened to Ms. Edmonds, he left the party and went to the police station because he was told the police might be looking for him. Although defense counsel attempted to show through Mr. McHenry’s time card that he had actually been at work that day, confusion as to the interpretation of the time card precluded a definitive resolution of the issue. Mr. McHenry maintained that he did not work that day.
The defense also called as witnesses members of the Bastrop Police Department who were involved in the 2006 incidents involving Ms. Edmonds and Mr. McHenry. Photographs of the injuries received by Ms. Edmonds in one of those incidents were misplaced or lost when the city of Bastrop changed its digital media storage system. The defense presented the testimony of the communications officer who took the 911 call from Ms. Ed-monds’ son reporting the shootings and the subsequent call suggesting Mr. McHenry as a suspect.
Eric Avery, who lived in the neighborhood where the murders were committed, testified that he saw both the defendant and Mr. McHenry on the night of the murders. He said he was on his porch smoking and drinking cognac at 10:30 p.m. when the defendant walked up and spoke with him. According to Mr. Avery, he and the defendant are friends, and they saw each other almost daily. The two men spoke for about 20 minutes after which the defendant walked away in the direction of Dotson Park, which 112was in the opposite direction of Ms. Edmonds’ house. Mr. Avery testified that about 15 to 20 minutes later, he observed Mr. McHenry park a Lincoln automobile and begin walking “up the street” toward a trail that led to Ms. Edmonds’ house. However, he lost sight of Mr. McHenry and was unable to say whether Mr. McHenry actually turned onto the trail. Finally, Mr. Avery testified that he went inside to go to bed at around 1:00 a.m. and he did not see either man again that night.
Also testifying for the defense was the former owner of the murder weapon, who stated that it was stolen from his car sometime before the murders and that it was still missing at the time of the murders. Mary McHenry, who was married to Mr. McHenry’s cousin, testified that her son was a suspect in the 2006 theft of the gun, that he supposedly gave it to a friend named Jeremy, and that she unsuccessfully tried to help the police recover the gun.
The state presented evidence pertaining to the defendant’s mental condition through the testimony of the members of the sanity commission, Dr. Williams and Dr. Phifer. Dr. Phifer testified that his initial evaluation of the defendant in 2008 — which resulted in his conclusion that the defendant was incompetent to proceed to stand trial and assist his defense counsel — was hindered by a lack of information. On the other hand, Dr. Williams, who had significantly more information about the defendant’s medical history than Dr. Phifer, believed that the defendant was malingering when he saw him in 2008. (According to medical records reviewed by the doctors, the mental health profession *595 als who treated the defendant at the 11gstate mental hospital apparently concurred in Dr. Williams’ assessment.) Dr. Williams and Dr. Phifer agreed that the defendant presented wholly differently to them in 2011 when they were asked to reevaluate him. Dr. Williams testified that the defendant was not malingering at this time. Based upon their 2011 evaluations, both doctors opined that the defendant knew the difference between right and wrong at the time of the murders.
Discussion
The defendant’s counsel zealously argues that there is more than a slight probability of misidentification in this case.[3] In support, the defendant focuses on Roshonda’s age of 12 years old at the time of the murders and contends that, in light of the striking resemblance of the two men, she could have easily mistaken Mr. McHenry for the defendant. The defendant points out all of the evidence that would support a motive and opportunity for Mr. McHenry and attempts to create doubt by emphasizing that Amberschelle was not close with her father, the defendant, and also suggesting that the defendant may have been framed.[4]
Contrary to the defendant’s assertions, the state presented ample evidence that the defendant was the shooter. This evidence included an eyewitness identification by Roshonda; Amberschelle’s testimony that the defendant asked Ms. Tyler for a gun and her identification of the gun that 114was later found concealed at the home of Ms. Tyler’s relative; the defendant’s unaccounted whereabouts during the shootings; his return and change of clothes, as observed by his daughter; the GSR found on the clothes he had been wearing; the pillowcase that had been in the SUV and in which the gun was concealed; his comment that “kids will lie”; and his knowledge that the deaths were by gunshot before the officers made him aware of the same. In addition, Amberschelle’s testimony that the defendant told her to “keep his name alive” before the police arrived is indicative and probative of his guilt.
The totality of the evidence dictates a finding that the state carried its burden of negating any reasonable probability of misidentification. This assignment of error is without merit.
MOTION TO SUPPRESS
The defendant argues that the trial court erred in denying his motion to suppress the identification that Roshonda Ed-monds made of him based upon a single photograph.
Legal Principles
Motions to suppress evidence are governed by La. C. Cr. P. art. 708 which provides in pertinent part:
A. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.
D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion....
*596 | ,-The courts of this state have held that a defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misiden-tifieation as a result of the identification procedure. An identification procedure is unduly suggestive if, during the procedure, the witness’s attention is unduly focused on the defendant. For this reason, identifications arising from single-photograph displays may be viewed in general with suspicion. State v. Sparks, 1988-0017 (La.5/11/11), 68 So.3d 435, cert. denied, — U.S. -, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012). However, their suggestive nature will not per se preclude admissibility unless found to be untrustworthy under the total circumstances. See State v. Goldston, 35,271 (La.App.2d Cir.12/5/01), 804 So.2d 141; State v. Anderson, 30,306 (La.App.2d Cir.1/21/98), 706 So.2d 598; State v. Harris, 28,517 (La.App.2d Cir.8/21/96), 679 So.2d 549, writ denied, 96-2954 (La.9/26/97), 701 So.2d 975.
The central question is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive. Thus, despite the existence of a suggestive pretrial identification, an in-court identification is permissible if, under all the circumstances, there does not exist a very substantial likelihood of irreparable mis-identification. State v. Sparks, supra.
In evaluating whether a suggestive identification presents a substantial likelihood of misidentification, our courts utilize the factors set forth in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Those factors include the opportunity of the witness to view the | lncriminal at the time of the crime, the witness’ degree of attention, the accuracy of the witness’ prior description of the criminal, the level of certainty demonstrated by the witness at the time of the confrontation, and the length of time between the crime and the confrontation. See State v. Harper, 93-2682 (La.11/30/94), 646 So.2d 338. See also Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
Discussion
On September 20, 2011, a hearing was held on the defendant’s motion to suppress the identification of him made by Roshonda Edmonds, which he claims was based upon viewing a single photograph and therefore “highly suggestive” and “illegal.” Ronald Lara, who had been a police detective for the City of Bastrop at the time of the offenses, testified regarding the investigation in this matter. He stated that he questioned Roshonda. She identified the assailant as the defendant by name. She was familiar with the defendant because he had dated her mother about two years before this incident and Roshonda had gone to the store with the defendant on several occasions. According to Detective Lara, Roshonda said that the defendant, Roderick Crossley, did this and she was 100 percent sure. Roshonda was not shown any photographs prior to her statement positively identifying the defendant as the assailant. After she said that Roderick Crossley had committed the murders, she was shown a driver’s license photograph of the defendant. Detective Lara said he showed the |17picture to Ro-shonda, not to identify the defendant, but to confirm that this was the person she was calling Roderick Crossley.
Jerome McHenry was also a suspect. Mr. McHenry was slightly taller than the defendant. According to Detective Lara, someone calling herself Shanisha Smith contacted police and stated that she saw *597 Mr. McHenry get out of a car with a gun and go to the victim’s house on the night of the offenses. Police were never able to locate anyone named Shanisha Smith. Detective Lara stated that he was not sure that such a person exists.
The trial court denied the motion to suppress, reasoning that the motion questioned whether there was a substantial likelihood of misidentification in this case. The trial court found that Roshonda was familiar with both the defendant and Mr. McHenry. She supplied the defendant’s name as the assailant and it was not given to her or suggested to her. The trial court found there was no taint or undue suggestiveness. However, the trial court stated that it would allow the defense to reurge the motion to suppress at a later date.
Without objection by the defense, Ro-shonda testified at trial and identified Mr. Crossley as the individual who committed these offenses. On the night her mother and Mr. Long were killed, Roshonda was awakened by gunshots. She saw Mr. Crossley come out of her mother’s room. Roshonda said she was in the kitchen and Mr. Long was in the living room. She saw Mr. Crossley shoot Mr. Long. Roshonda said that Mr. Crossley was five or six steps from her and she saw his whole face straight on.
11gRoshonda stated that she knew Mr. McHenry and that he and the defendant were about the same size. She testified that Mr. McHenry was not the person who shot Mr. Long. Roshonda stated that on the night she was questioned about the offenses, she was shown one picture. On cross-examination, defense counsel showed her a picture which she correctly identified as Mr. McHenry. On redirect, she was shown a picture which she correctly identified as Mr. Crossley.
After the trial, the defendant attempted to reurge his motion to suppress Roshon-da’s identification of him. On August 3, 2012, the defendant filed a motion for new trial and a motion for post verdict judgment of acquittal, raising several issues, including the argument that identity was very important in this case and that the suggestive identification by Roshonda could have and likely did result in a mis-identification. According to the defense, the evidence which came out at trial regarding the similarity in appearance between Mr. Crossley and Mr. McHenry showed that the trial court should have suppressed the identification of the defendant.
At the hearing on the motion, the trial court acknowledged that at the hearing on the motion to suppress, it stated that the motion could be reurged at a later date if, as the trial went along, there was additional information regarding the identification procedure or a likelihood of misidentification. However, the trial court did not intend that the motion to suppress would be reurged following the trial.
|13The trial court found that there were no indicia of unreliability in the identification, no substantial likelihood of misidenti-fication, and nothing in the course of the trial to cause the court to reverse or change the ruling previously entered. The court found that the identification was proper and was properly admitted.
This matter differs from the usual identification process in which a witness sees a stranger commit an offense and is then asked to identify the perpetrator. Here, Roshonda knew the defendant and stated that she was 100 percent sure that the defendant was the individual she saw shoot Mr. Long in the living room of her home. Only after her statement to police that Mr. Long was shot by Mr. Crossley was she shown the picture of the defendant to ensure that the defendant was actually the *598 person she identified as the assailant. She correctly identified Mr. Crossley in the photograph.
The evidence shows that Roshonda had ample opportunity to view Mr. Crossley at the time of the crime. She testified that she was standing in the kitchen, there was a light on and she could see Mr. Crossley and Mr. Long in the living room when Mr. Crossley shot Mr. Long. She stated that Mr. Crossley was only a few steps away from her and she saw his face straight on.
Roshonda’s degree of attention at the time she saw Mr. Crossley was high. She was awakened by gunshots, ran from her bedroom to the kitchen, and observed Mr. Crossley come out of her mother’s room. She saw Mr. Long in the living room and heard him say, “run, he got a gun,” and then he said, “please help.” She saw Mr. Crossley shoot Mr. Long. Roshonda 12ndescribed her relationship and familiarity with Mr. Crossley, establishing how she knew him and was able to recognize him. Roshonda stated that she was 100 percent sure Mr. Crossley had committed the crimes. Right after the shootings, Ro-shonda told her brother that Mr. Crossley was the shooter. Roshonda then gave her statement to police and observed the picture of Mr. Crossley on the night the offenses were committed. From the night of the offenses through her testimony at trial, Roshonda was entirely consistent in stating that Mr. Crossley shot Mr. Long. Also, Roshonda demonstrated on several occasions that she could clearly distinguish between Mr. Crossley and Mr. McHenry.
The evidence in this case establishes that the identification procedure was not suggestive and there was no likelihood of misidentification. We find no error in the trial court ruling denying the motion to suppress, the motion for new trial, or the motion for post verdict judgment of acquittal which purported to reurge the issues raised in the motion to suppress. The trial court correctly found that the identification was reliable and was admissible.
This assignment of error lacks merit.
SPOLIATION OF EVIDENCE
The defendant argues that the trial court erred in failing to find that there was spoliation of evidence, because the Bastrop Police Department failed to preserve GSR evidence taken from Mr. McHenry’s hands and the photographs taken of Ms. Ed-monds after Mr. McHenry attacked her in 2006. These arguments were never raised pretrial or during the trial and the trial court was not asked to deal with this issue until after the trial was over.
12i Discussion
At trial, it was shown that Mr. McHenry appeared at the police station after the shootings and police swabbed his hands for GSR. However, the swabs were not submitted for testing and were lost. There was also discussion at trial of photographs of Ms. Edmonds taken in 2006, after an altercation with Mr. McHenry. The officer was questioned about the photographs and stated that the pictures got lost or were not downloaded. However, photocopies of the pictures were available at trial and the officer was questioned extensively about Ms. Edmonds’ injuries.
Where issues of spoliation of evidence are raised, the defense often invokes the presumption found in La. R.S. 15:432 and requests a jury instruction to that effect.[5] In this case, the defendant did not request *599 any special jury instructions or otherwise object at trial regarding the issue of spoliation of evidence.
Here, the jury was clearly instructed to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. Further, defense counsel argued extensively about the GSR and even brought it to the attention of the jury in the opening statement.
La. C. Cr. P. art. 841 provides in pertinent part:
A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient |22that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem and prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. State v. Ballay, 99-906 (La.App. 5th Cir.2/29/00), 757 So.2d 115, writ denied, 2000-0908 (La.4/20/01), 790 So.2d 13.
Because the defendant failed to raise the issue of spoliation of evidence in the trial court, it is not properly before this court on appeal. However, we find that no trial court error occurred in this matter. The theory of spoliation of the evidence refers to an intentional destruction of evidence for the purpose of depriving the opposing parties of its use. Spoliation creates a presumption that the evidence was destroyed because it would have been detrimental to one’s case. However, the presumption of spoliation is not applicable when failure to produce the evidence is adequately explained. State v. Bobo, 46,225 (La.App.2d Cir.6/8/11), 77 So.3d 1, writ denied, 2011-1524 (La.12/16/11), 76 So.3d 1202.
The theory of spoliation of the evidence is generally utilized in civil litigation. In criminal cases, an appellant is not deprived of his due process rights based upon the state’s failure to preserve potentially exculpatory evidentiary material unless bad faith is demonstrated. To receive the adverse inference, two conditions are required, destruction of evidence and 1 gjbad faith. State v. Goosby, 47,772 (La. App.2d Cir.3/6/13), 111 So.3d 494. See Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); State v. Harris, 2001-2730 (La.1/19/05), 892 So.2d 1238, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); State v. Seals, 09-1089 (La.App. 5th Cir.12/29/11), 83 So.3d 285, writ denied, 2012-0293 (La.10/26/12), 99 So.3d 53, cert. denied, — U.S. -, 133 S.Ct. 2796, — L.Ed.2d - (2013), 2013 WL 373571.
In this case, as noted above, there was no objection at trial to any issue regarding the loss of evidence. Further, there is no showing in the record that the loss of the GSR swab or the photos of Ms. Edmonds after her altercation with Mr. McHenry in 2006, were attributable to any bad faith on the part of the prosecution or law enforcement officials. The defendant’s claim on this issue is without merit.
COMPETENCY TO STAND TRIAL
The defendant argues that the trial court erred in finding him competent to stand trial or tacitly finding him able to tell right from wrong at the time of the offenses.
*600 Legal Principies
A criminal defendant has a constitutional right not to be tried while legally incompetent. A state must observe procedures adequate to protect a defendant’s right not to be tried while incompetent, and its failure to do so deprives the defendant of his due process rights to a fair trial. State v. Carmouche, 2001-0405 (La.5/14/02), 872 So.2d 1020; State v. Edwards, 44,552 (La.App.2d Cir.8/19/09), 17 So.3d 1037.
[^Louisiana’s statutory scheme for detecting mental incapacity jealously guards a defendant’s right to a fair trial. State v. Carmouche, supra.
La. C. Cr. P. art. 641 sets forth:
Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.
La. C. Cr. P. art. 643 provides that a court shall order a mental examination of a defendant and accordingly appoint a sanity commission when it has reasonable ground to doubt the defendant’s mental capacity to proceed. Reasonable ground in this context refers to information which, objectively considered, should reasonably raise a doubt about the defendant’s competency and alert the court to the possibility that the defendant can neither understand the proceedings, appreciate them significance, nor rationally aid his attorney in his defense. In the exercise of its discretion, the court may consider both lay and expert testimony before deciding whether reasonable grounds exist for doubting the defendant’s capacity to proceed and ruling on the defendant’s motion to appoint a sanity commission. State v. Carmouche, supra.
The defense carries the burden of proving by a clear preponderance of the evidence that, as a result of a mental disease or defect, he lacks the capacity to understand the proceedings against him or to assist in his defense. The judge’s determination of a defendant’s present mental capacity is entitled to great weight and his ruling will be reversed only if it is clearly erroneous. State v. Bennett, 345 So.2d 1129 (La.1977).
12óThe decision as to a defendant’s competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced. State v. Bennett, supra. In State v. Bennett, supra, the supreme court stated that the appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include:
whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.
The supreme court in State v. Bennett, supra, also stated that the facts to consider in determining an accused’s ability to assist in his defense include:
whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and *601 inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
Discussion
We find no error in the trial court’s determination that the defendant was competent to stand trial. In March 2008, the defense filed a motion to appoint a sanity commission to examine the defendant as to his present ^mental condition and his mental condition at the time of the offense. The defense argued that there was good reason to believe that the defendant did not have the mental capacity to understand the proceedings against him or to assist in his defense. The defense cited two previous mental examinations of the defendant in support of its argument. These evaluations appear to have been conducted in conjunction with the defendant’s application for Social Security Disability benefits. The trial court granted the application and appointed Dr. Phifer and Dr. Williams to the sanity commission.
On May 13, 2008, Dr. Phifer sent a letter to the trial court outlining his examination and evaluation of the defendant. He said that the defendant was aware of his incarceration, but was unable to convey the reason for it. He did not understand the function of the judge or the court and had no understanding of the legal process. According to Dr. Phifer, the defendant did not know that he had a defense attorney appointed to represent him.
Dr. Phifer had access to the 1997 evaluations of the defendant for Social Security by Dr. Mitchell Stephens, a psychiatrist, and Dr. Ross Reiser, a psychologist. Dr. Stephens found that the defendant had a psychotic disorder, based on complaints of auditory hallucinations, poverty of content of speech, guardedness and suspiciousness. The results of Dr. Reiser’s psychological testing showed the defendant to have a full scale IQ of 45 and raised questions as to whether the defendant was profoundly retarded or profoundly psychotic. Dr. Phifer stated that when he examined the defendant, he did not appear to be confabulating, or withholding information or in any other way attempting to deceive Dr. Phifer.
127Pr. Phifer found that the defendant was not competent to proceed to trial at that time. According to Dr. Phifer, the defendant did not understand the charges against him, or the potential consequences of being convicted of these crimes. He did not understand the legal process or the function of a court, had a very limited vocabulary with limited intellect and would not be able to assist an attorney in preparing his defense or to listen to testimony and counter any distortions or misstatements. Dr. Phifer stated that the defendant suffered from mild mental retardation which is a static condition and not expected to resolve with treatment.
On May 7, 2008, Dr. Williams sent a letter to the trial court detailing his evaluation of the defendant. The defendant told Dr. Williams that he attended school through the seventh grade, had never had a job, had never been married, and had no children.[6] The defendant knew that he was charged with murder, but denied knowing who was killed.
*602 Dr. Williams stated that the defendant laughed inappropriately at times, not of a psychotic nature, but of a malingering fashion. Dr. Williams saw no evidence of auditory or visual hallucinations, delusions, association defects, referential thinking, or flight of ideas. Dr. Williams’ diagnostic impression was that the defendant was malingering and had mild mental retardation.
Dr. Williams found that, at that time, the defendant did not have the ability to consult with his attorney with a reasonable degree of rational ^understanding. Dr. Williams had access to both evaluations of the defendant made to obtain Social Security Disability benefits. In his first evaluation in approximately 1991, the defendant’s IQ was 69. Several years later in approximately 1997, when reapplying for Social Security Disability benefits, his IQ score was 45. Dr. Williams stated that it was clear from the defendant’s behavior in the present examination, such as hiding clothing in a black bag under his bed, denying his daughter, his previous testimony before the Social Security Administration, and having an IQ in the range of 70, that he was malingering and in fact was attempting to act in a profoundly mentally retarded fashion. Dr. Williams stated, “No one who is that level of retarded would be able to malinger as he.” Dr. Williams added that, as a result of the defendant’s failure to cooperate, he was unable to determine the defendant’s knowledge of right from wrong with reference to the conduct in question at the time of the alleged offense. Dr. Williams stated that, if the court determined that the defendant was not competent to proceed, he should be transferred to ELMHS, where he would be incarcerated, medicated if needed, observed over a period of time, and reinstated to a state of competency where he could proceed to trial.
On June 26, 2008, the trial court entered a judgment finding that, after a hearing and review of the sanity commission reports, the defendant lacked the mental capacity to proceed because he had a mental disease or defect which rendered him incapable of understanding the proceedings against him and assisting in his defense. The proceedings were suspended and the defendant was committed to ELMHS.
129The defendant was eventually admitted to ELMHS. On November 9, 2009, the hospital made a forensic competency evaluation and report which noted that upon admission, he did not present with any overt signs of psychosis that would warrant treatment with psychotropic medications. Part of the defendant’s evaluation included a malingering assessment. A psychological consultation report in November 2009 showed that his IQ could not be obtained through testing because his scores fell in the range of those classified as malingering. This indicated that the defendant made an insufficient effort to do well, at best, and made a deliberate attempt to feign memory and intellectual impairment, at worst. It was noted that prior testing showed that the defendant had an IQ in the range of 70 in 1991, in conjunction with an application for Social Security Disability benefits, and an IQ of 45 in approximately 1996, also in conjunction with an application for Social Security Disability benefits. According to the psychological consultation report, there was no data available to explain a discrepancy to this degree.
The diagnostic impression of the defendant stated that malingering would be a plausible explanation for his presentation of symptoms of psychosis and severe cognitive problems. Mental retardation was ruled out and the level of intelligence demonstrated by the defendant suggested that he should not have significant problems *603 learning new information needed to be determined competent to proceed to trial.
The defendant was enrolled in a competency restoration program. As the weeks progressed, he demonstrated a good knowledge of the courtroom | ^proceedings against him. According to the hospital, approximately six weeks after his admission, the defendant was able to answer all of the questions related to the criteria in State v. Bennett, supra, set forth above. Following a formal assessment by those treating the defendant, the general consensus was that he was making a conscious effort to embellish and exaggerate his symptoms.
On November 20, 2009, the hospital sent a letter to the trial court reporting that, after comprehensive evaluation and treatment, the defendant had the mental capacity to proceed because he now understood the proceedings against him and could assist his attorney in his defense. According to the hospital evaluation, the defendant was taking only an antidepressant medication on admission. The hospital found that the defendant had a depressive disorder, was malingering psychosis, had cognitive deficits, and was dependent on alcohol and hallucinogens, which was in remission iin a controlled environment. At a hearing on December 29, 2009, the trial court found that the defendant was competent to Iproceed to trial. The defense did not ob-Iject to this ruling.
I Pursuant to instructions by the trial court, on January 11, 2011, the state filed a Inotion for the appointment of another sanity commission to determine whether the llefendant knew right from wrong at the lime of the offense. Dr. Williams reexam-lied the defendant and sent a letter to the ■ial court on May 12, 2011. Dr. Williams ■included that the defendant was compe-■nt to stand trial and, at the time of the Jleged offenses, he was not |31 suffering from any mental disease or defect that rendered him incapable of distinguishing right from wrong with reference to the conduct in question.
Dr. Williams testified at trial that the defendant was malingering when he was examined in 2008. In 2011, the defendant was more forthcoming in his information and answered questions more thoroughly.
Dr. Phifer was also appointed to the second sanity commission and testified at trial. He stated that in 2008, the defendant appeared to be psychotic, but in 2011, he was a completely different man. Dr. Phifer testified that in 2008, Dr. Williams evaluated the defendant one week prior to Dr. Phifer’s evaluation. According to Dr. Phifer, if he had read the report by Dr. Williams in 2008, he would also have considered malingering as a strong part of his opinion. In 2011, Dr. Phifer found that the defendant had the capacity to stand trial. Dr. Phifer also stated that, based on the 2011 evaluation, it is likely that the defendant would have been able to tell the difference between right and wrong at the time of the offenses.
The record shows that in 2008, the defendant was found not competent to stand trial. After the defendant was admitted to ELMHS, it was established that he was malingering. The defendant was educated regarding the judicial process and it was established that he was competent to stand trial. There is no showing that the trial court erred in finding that the defendant was competent to stand trial based upon this extensive medical evidence. Further, the defense lodged no objections to the trial court’s rulings on this issue.
|32The defendant argues that the trial court erred in tacitly finding that he was able to tell right from wrong at the time of the offenses. A determination of sanity at the time of the commission of the *604 offense is a factual matter and it to be made by the finder of fact. See State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27. A defendant’s knowledge of the difference between right and wrong is relevant in determining his criminal liability, but is totally ii-relevant to the issue of his competency to stand trial. See State v. Bennett, supra. The trial court ruled only on the defendant’s competency to stand trial. It did not make any findings, tacitly or otherwise, regarding his sanity at the time of the commission of the offenses. It would have been up to the jury, as the trier of fact, to make a determination as to the defendant’s sanity when the offenses were committed. However, in this case, although the defendant entered the dual plea of not guilty and not guilty by reason of insanity, defense counsel, with the express consent of the defendant, did not contend that the defendant should be excused from criminal liability in this matter because he was insane at the time the offenses were committed. Rather, defense counsel consistently argued that the defendant did not commit the offenses. Defense counsel explained that the plea of not guilty by reason of insanity was made only in order to present evidence regarding the defendant’s mental condition in order to explain actions and statements made after or during the course of the investigation. The trier of fact, which in this case was the jury, was not called upon to and did not make a finding as to whether the defendant was insane at the time of the commission of the offenses. Although both Dr. lasWilliams and Dr. Phifer concluded that the defendant understood right from wrong at the time of the commission of the offenses, this was not an issue at the trial.
This assignment of error is without merit.
EXCESSIVE SENTENCES
The defendant argues that, due to the “paucity of evidence” against him and his limited mental capacity, the mandatory life sentences imposed upon him are constitutionally excessive.
Legal Principles
Where, as here, no motion to reconsider sentence was filed, the defendant is relegated to a claim of constitutional excessiveness. State v. Guess, 47,370 (La.App.2d Cir.8/8/12), 104 So.3d 41, unit denied, 2012-1987 (La.3/8/13), 109 So.3d 357.
The test for constitutional ex-cessiveness is whether the sentence is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Guess, supra, citing State v. Smith, 2001-2574 (La. 1/14/03), 839 So.2d 1, and State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Guess, supra; State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166; State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379.
The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment under |34La. Const, art. 1, § 20 has been repeatedly rejected. State v. Guess, supra; State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); State v. Bryant, 29,344 (La.App.2d Cir.5/7/97), 694 So.2d 556.
Discussion
Even though the legislature has provided a mandatory life sentence without benefits for the crime of second degree murder, the trial court ordered a presen-tence investigation. Before imposing sen-1 fence, the trial court thoroughly consid-| *605 ered the factors of La. C. Cr. P. art. 894.1 and painstakingly articulated the basis for the sentences imposed. The trial court specifically noted the seriousness of the offenses and the horrible loss suffered by the families of the two murder victims.
The circumstances of these murders were particularly harrowing. Ms. Ed-monds was shot in her bedroom while her three children slept in the next room. Mr. Long was shot multiple times as he attempted to escape from the defendant and to warn the children to flee. In the ensuing chaos, the children scattered. As Ms. Edmonds’ older son heroically shielded his little brother with his own body in one room, her 12-year-old daughter ran to the kitchen. From this vantage point, the frightened girl helplessly watched as the defendant shot Mr. Long. The defendant was aware that the children lived in the house as evidenced by his comment that “kids will lie” when the police advised him that there were witnesses to the shootings. Furthermore, the fact that the defendant is a slow learner or has a low IQ does not insulate |3F,him from punishment for these terrible crimes. The mandatory life sentences imposed in this case do not shock the sense of justice.
This assignment of error is without merit.
PRO SE ASSIGNMENTS OF ERROR
The defendant filed a pro se brief which appears to assert two arguments — “witness error” and “error of judge and courts.” He makes numerous factual assertions which are not supported by the evidence presented at trial. Essentially, he alleges a conspiracy orchestrated by the police to frame him for the murders and involving the complicity of the main witnesses at trial, including his own daughter. Most of his complaints, such as sufficiency of evidence and spoliation of evidence, have already been addressed in the assignments of error asserted on appeal by defense counsel. We will now attempt to address the additional issues raised by the defendant.
Photo Confusion
The defendant contends that in his rebuttal argument, the prosecutor misrepresented to the jury that defense counsel had held up a photo of the defendant during his closing argument when he meant to show a photo of Mr. McHenry.
Review of the record indicates that during the defense’s closing argument, while arguing that the defendant and Mr. McHenry resembled each other, defense counsel held up a photo supposedly of Mr. McHenry and said, “It’s hard to tell the difference even with — As a matter of fact, I would have thought that this was Roderick.” At the beginning of his prebuttal argument, the prosecutor asserted that the photo held up by defense counsel was actually a photo of the defendant, not Mr. McHenry. Defense counsel objected, asserting that the statement misrepresented what he did. The trial court overruled the objection on the basis that the jury could decide what was argued or not argued. Between the conclusion of closing arguments and the trial court’s reading of the jury instructions, defense counsel moved for a mistrial. The motion was denied; the trial court found no grounds for mandatory mistrial under La. C. Cr. P. art. 770. The trial court also declined to give an admonition to the jury under La. C. Cr. P. art. 771, as that would constitute the court making a comment upon the evidence, which is prohibited under La. C. Cr. P. art. 772. The trial court concluded that the jury was “perfectly capable of sorting out” whether the prosecutor was incorrect in saying that defense counsel showed them the wrong photo.
*606 We agree with the trial court’s analysis of this issue. The members of the jury observed the photo utilized during closing arguments. They were in a position to determine for themselves what in fact occurred and it was within their province to accept or reject the arguments made by the lawyers on this matter. Further, the jury instructions clearly provided that statements and arguments made by the attorneys are not evidence.
We find no merit to these pro se assignments of error.
| ^Ineffective Assistance of Counsel
The defendant also alleges ineffective assistance of counsel in failing to interview witnesses. Specifically, he contends that his trial counsel did not interview the “lone eyewitness to Defendant’s killings prior to Defendants [sic] murder trial to ensure that he would corroborate Defense theory” and that trial counsel interviewed the “primary mental health expert only days before trial.” He also seems to claim that his trial counsel should have retained a mental health expert in “reasonable time in advance of trial.”
In assessing a claim of ineffective assistance of counsel, a two-pronged test is employed. The defendant must show that: (1) his attorney’s performance was deficient, and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief (PCR) in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State v. Payne, 47,481 (La.App.2d Cir. 12/12/12), 108 So.3d 174. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Payne, supra.
While the record generally reveals the presentation of a spirited and impassioned defense by the defendant’s trial attorneys, it is insufficient for this court to review the specific issues of ineffective assistance alleged by the defendant. We do note that the record indicates that defense counsel did |3Sattempt to interview at least one of the state’s witnesses, Amberschelle Hampton, who exercised her right not to talk to defense counsel.[7] Further, the defense in this case was mistaken identity and not insanity. Consequently, there does not appear to be a reason to hire a mental health expert to testify at trial. However, the defendant’s remedy is PCR wherein the quality of the attorney’s performance can be fully developed and explored in an evidentiary hearing. Thus, this issue is not properly before this court and we will defer the claim of ineffective assistance of counsel to PCR. State v. Kinsey, 42,935 (La.App.2d Cir.2/13/08), 976 So.2d 315.
CONCLUSION
The defendant’s convictions and sentences are affirmed.
AFFIRMED.

. The sanity commissions will be discussed in greater detail infra under the appropriate assignment of error.

. Ms. Tyler was charged as an accessory after the fact to two counts of second degree mur *593 der. She invoked her Fifth Amendment rights and refused to testify at the defendant's trial.

. In his pro se brief, the defendant similarly attacks his convictions and the testimony of the witnesses against him.

. In support of his theory, the defendant cast aspersions on the paternity of two of the main witnesses against him — Roshonda and Am-berschelle — insinuating that the former was Mr. McHenry’s child and that the latter was not the defendant’s daughter. He also alleged that Mr. McHenry had a relationship with the Bastrop Police Department as an informant and that the police were consequently motivated not to pursue him as a suspect in the Edmonds/Long murders.

. La. R.S. 15:432 provides in pertinent part: A legal presumption relieves him in whose favor it exists from the necessity of any proof; ... such is the presumption ... that evidence under the control of a party and not produced by him was not produced because it would not have aided him....

. Odier information regarding the defendant, some of which was available to Dr. Williams, showed that the defendant attended school beyond the seventh grade, that he had been married, that he had some work history, and that he had at least one child.

. A witness is free to choose whether he or she speaks with opposing counsel and that determination shall be made by the witness alone, as long as the state does not deny the defense access to the witness. State v. Casey, 1999-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).