981 So.2d 185 (2008)
STATE of Louisiana, Appellee,
v.
Robert E. MACK, Jr., Appellant.
No. 43,206-KA.
Court of Appeal of Louisiana, Second Circuit.
April 23, 2008.
Carey J. Ellis, III, Louisiana Appellate Project, for Appellant.
Iley H. Evans, District Attorney, Ashley P. Thomas, Assistant District Attorney, for Appellee.
Before BROWN, CARAWAY, and LOLLEY, JJ.
BROWN, Chief Judge.
Defendant, Robert E. Mack, Jr., was convicted of second degree murder and was sentenced to life imprisonment at hard labor without benefit of probation or parole. A motion for new trial was denied and defendant now appeals his conviction. Finding no error, however, we affirm defendant's conviction and sentence.

Procedural History
On December 3, 2003, defendant was indicted by a grand jury in Caldwell Parish, Louisiana, for the second degree murder of Christopher Dale Claunch. The indictment alleged that, "under circumstances that indicate that Robert Earnest Mack, Jr., desired to kill Christopher Dale Claunch, did shoot Christopher Dale Claunch in the head with a small caliber gun causing the death of Christopher Dale Claunch, all in violation of LRS 14:30.1(A)(1)." The record shows that the *186 indictment was endorsed by the jury foreman "a true bill" on 12/03/03.[1]
Defendant was tried by a jury in January 2007, and convicted of second degree murder by a vote of 11 to 1. On May 1, 2007, the date of the sentencing hearing, defendant's attorney filed a motion for new trial, alleging that during the trial, two witnesses, Cynthia Roy and Nicola Roy, hid from defendant, and that because he was unable to produce these witnesses, he was deprived of a fair trial. The trial court heard argument on the motion before denying the requested relief. The court subsequently sentenced defendant to life imprisonment at hard labor without benefit of probation or parole and defendant was ordered to pay $10,000 to the victim's family for his funeral expenses. On May 7, 2007, the instant appeal was filed.

Discussion
Sufficiency of the Evidence
Appellate defense counsel in brief recaps the witnesses' testimony and notes that a homicide that would otherwise be murder is manslaughter if committed in sudden passion or heat of blood. The state points out that the evidence establishes that Christopher Dale Claunch died of a single gunshot wound to the head and that Allen Perkins, an eyewitness, identified defendant as the shooter. The state notes that if defendant was extremely upset and provoked as defense counsel argues, then defendant would have attacked Claunch initially rather than leaving and returning to the scene and shooting him.
Applicable Legal Principles
Under the pertinent provisions of La. R.S. 14:30.1(A), second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. On the other hand, under the applicable provisions of La. R.S. 14:31, manslaughter is a homicide which would be murder under either article 30 (first degree murder) or article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, at the time the offense was committed.
In the instant case, the state had to prove that defendant killed Christopher Dale Claunch when defendant had the specific intent to kill or inflict great bodily harm. Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Draughn, 05-1825 (La.01/17/07), 950 So.2d 583, cert. denied, ___ U.S. ___, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244: State v. Taylor, 24,947 (La.App.2d Cir.06/23/93), 621 So.2d 141, writ denied, 93-2054 (La.02/11/94), 634 So.2d 371.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light *187 most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.02/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La.09/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. Art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/04/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.08/30/02), 827 So.2d 508, writ denied, 02-3090 (La. 11/14/03), 858 So.2d 422.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App. 2d Cir.09/18/02), 828 So.2d 622, writ denied, 02-2595 (La.03/28/03), 840 So.2d 566, writ denied, 02-2997 (La.06/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.05/09/07), 956 So.2d 769; State v. Burd, 40,480 (La. App.2d Cir.01/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/09/06), 941 So.2d 35.
Trial Testimony
The state's first witness was Dr. Susan Garcia, the forensic pathologist who conducted the autopsy on Christopher Dale Claunch. Dr. Garcia established that Claunch died of a single bullet wound to the head. Specifically, the entry wound was on the left back of Claunch's head behind his left ear. Dr. Garcia explained her conclusion that the gunshot wound was "distant," meaning that the shot was fired from a distance of 18 inches or more.
Deputy Jack McKeithen of the Caldwell Parish Sheriff's Department testified that on the day of the incident, he was dispatched to the crime scene at 125 Cedar Lane in Hebert, Louisiana. Deputy McKeithen's testimony was used to introduce photographs of the scene. He also testified as to the position of Claunch's body, and indicated that he found two white males  Jack Murray and Allen Perkins  at the scene. Perkins told Dy. McKeithen that a black man had shot his friend. Perkins described where the shooter lived and stated that the vehicle the shooter was driving was a black Chevrolet pickup. According to Dy. McKeithen, Perkins indicated that Claunch and the shooter had words; the shooter said he was on probation and didn't want to mess that up; the shooter then left, but returned two or three minutes later and shot Claunch in the back of the head.
Kevin Wyles, currently with the Louisiana Department of Probation and Parole, testified that he was a detective with the Caldwell Parish Sheriff's Department at the time of the shooting. His testimony corroborated that of Dy. McKeithen as to what Perkins reported to officers about *188 the incident. Officer Wyles testified that he was later involved in a search of the shooter's residence, which was conducted upon permission of Cynthia Roy, who lived at the trailer. No weapon was found, and defendant was not at his home.
On cross-examination, Officer Wyles recalled that the verbal confrontation between Claunch and the black male, as told by Perkins, involved racial slurs back and forth, and included a statement by the black male to Claunch that if he could prove that Claunch was the one driving the white truck that ran his child off the road, he would kill Claunch.
Detective Tony Childress testified that he investigated the crime scene on the date of the shooting. He looked for stray bullets and casings but found none. Det. Childress corroborated that no weapon or ammunition was found in the search of defendant's residence. Det. Childress also indicated that defendant was apprehended at Arbor House in West Monroe, and that a search of defendant's vehicle, done pursuant to a warrant, revealed no ammunition, weapon, or blood stains.
Trooper Mark Dennis testified that at the time of the incident, he worked for the West Monroe Police Department. On the day of the crime, he was asked by the Caldwell Parish Sheriff's Office to help them find the suspect, Robert E. Mack, Jr. Trooper Dennis went to talk to Cynthia Roy, who was reported to be the suspect's wife, at Arbor House, her place of employment. When Trooper Dennis and a Captain Sasser arrived at Arbor House, they saw a man fitting the description of the suspect sitting in a rocking chair at the front door. The man stated, "I'm not gonna lie to you, that's, that's me, I'm Robert Mack," referring to a driver's license photo that Capt. Sasser held up. Defendant was then arrested and read his Miranda rights.
Jack Murray testified that he was Allen Perkins' stepfather and that he, his wife, and his stepson lived at 125 Cedar Lane at the time of the incident. On the date of the shooting, October 29, 2003, Christopher Claunch and Murray's stepson, Allen Perkins, came to the house around four or five in the afternoon after they got off work. Murray was alone in the trailer when he saw Perkins and Claunch drive up. About five minutes later, Murray saw a dark colored truck pull up. Shortly thereafter, Perkins shouted for him to call 911 because Claunch had been shot. Murray never saw the dark colored truck leave, but he went outside after hearing Perkins and found Claunch dead. Murray did not hear the shots, but admitted that he has a hearing problem and indicated that there were three birds in the house, and the television and an air conditioner were both on at the time of the shooting. Murray stated that he would have been able to hear a high-powered shot, and noted that "they's shooting going on over there most all the time, people sighting in their rifles, killing snakes, and so on and so forth, there's a lot of shooting going on over there."
Allen Perkins, the only eyewitness to the shooting, testified that on October 29, 2003, he and Claunch, who were carpenters, had been riding to work together for a couple of weeks. Claunch would drive his vehicle to Perkins' home and park, then Perkins would drive them to work in his truck. Perkins testified on cross-examination that they never took Claunch's truck because he didn't have an inspection sticker and/or insurance on the vehicle. On the day of the incident, they were returning from work, drinking a six-pack of beer they had just bought. Perkins stated that each drank two or three beers. They drove past defendant's residence, where defendant, his wife and two children were *189 working in the yard. The windows of the truck were down and the stereo was "wide open."
When Perkins was asked if "words passed" when Claunch went by defendant's house, Perkins admitted that Claunch "said something," but Perkins claimed he didn't know what was said. A couple of minutes after Claunch and Perkins arrived at Perkins' residence, defendant drove up in a dark Chevrolet truck. Defendant got out and asked Claunch about Claunch's truck which was parked at the home. Defendant told Claunch, "If I find out that's you driving that little white truck, I'll kill your white, white honky ass." Then Claunch responded, "We'll finish it right now you (expletive) nigger." Defendant said that he was on parole and drove off. Perkins asked Claunch what was going on, and Claunch told him, "Nothing, just don't worry about it, it ain't nothing." Two or three minutes later, defendant drove back up, approached Claunch and said, "We're gonna finish it." He then pulled out a small handgun. When Claunch saw the gun, he started to walk away from defendant and told Perkins to "call the law." Perkins went around the back of the truck to the house because defendant had pulled out a weapon. Perkins heard three or four shots, but he was not looking at the gun when it was fired.
According to Perkins, defendant had put the gun right behind Claunch's left ear. When Perkins was asked on cross-examination how defendant could have missed two or three times, he responded that maybe defendant was not shooting at Claunch the other two times. Perkins testified on redirect that defendant appeared to be upset at the first encounter at Perkins' home but appeared calm the second time when he returned.
Perkins stated that he had never had a conversation with defendant. Perkins indicated that defendant's wife was white, and when asked whether that bothered him, the witness responded that it did not. Perkins denied ever being with Claunch when he tried to run anyone off the road, and he denied that any kind of incident or confrontation had occurred on any other day when the two were riding past defendant's house.
The defense recalled Detective Childress to the stand at that time. Detective Childress testified that the disagreement between defendant and Claunch, as related by Perkins, involved defendant being angry about racial slurs made toward him by Claunch as he passed defendant's home. The officer's testimony also indicated that he did not recall notifying probation and parole after arresting defendant, something that is normally done if the person arrested is on probation or parole. This testimony was elicited by defense counsel to rebut Perkins' testimony that on the date of the shooting defendant told Claunch that he was on parole.
In an attempt to show prior acts of harassment of defendant and his family by the victim, Chris Claunch, the defense called Dy. Washam, who acknowledged writing a police report on a complaint by a Gearlynn Allen (who he assumed was the person from whom defendant and his family were renting their home) about some feces being placed on the porch of their home then being blown up with firecrackers. However, Dy. Washam investigated and found no evidence to support the complaint, which could not be tied to any particular person.
When defense witnesses Cynthia and Nicola Roy (defendant's wife and stepdaughter), did not appear to testify, there was a discussion between the state's attorney, defense counsel, and the judge. Apparently, Cynthia had been subpoenaed by the state, not the defense, and the state *190 had never been able to locate her, although a tape recording of a statement by her had been made. The state offered to stipulate to the playing of the tape in Cynthia's absence. According to the district attorney, the statement "dovetails some of the testimony that was already given by [Deputy] Washam. Uh, right on down the line . . ." However, the D.A. was not willing to stipulate as to what Nicola would testify "because it is very obvious that she is very hostile, uh, toward someone. Uh, my understanding that she was really rude to [defense counsel] on the phone, that she said she wasn't coming and he could take a ____ leap."
Louis Scott, defendant's attorney, responded that Cynthia Roy was "of similar nature about coming to court. So, we really don't know what she would testify to if she came also, uh, even though she's on tape." After further discussion, the attorneys agreed to a stipulation that defense counsel subsequently put before the jury. The stipulation was that Nicola Roy, if she had testified, would have stated that she was in the car driven by Junior Roy (her brother) at the time of an incident covered by a complaint to the Sheriff's Department, the admission of which also was subject to stipulation. (The complaint was admitted as exhibit D-2 and was viewed by the jury.) The complaint, made by Junior Roy on 08/04/2003, stated that he was receiving harassment from Christopher Claunch who tried to run him off the road. A Deputy Gore had spoken with Claunch's wife, Bridgette Ann Bass. According to the complaint, Ms. Bass and a Ms. Tucker both advised that Claunch had slammed on his brakes in front of Junior Roy when Claunch had Ms. Bass and small children in the car. Ms. Bass and Ms. Tucker advised that Claunch did not hold a beer bottle out of the window. Instead, Ms. Bass advised that had been done by "Larissa's brother."
Analysis
We agree with the state's position that the evidence in this case is sufficient to support the conviction of second degree murder. There is no dispute that Claunch was killed by a bullet wound to the head, and the only eyewitness identified defendant as the shooter. Furthermore, while Perkins might have been less than forthcoming about Claunch yelling at defendant as they passed his residence, the jury obviously believed Perkins' unrefuted testimony that defendant shot Claunch. Under the evidence presented, particularly Perkins' uncontradicted testimony that defendant was upset during the first encounter with Claunch but seemed calm when he returned with his gun and shot the victim, the jury could have found, even if there was sufficient provocation, that an average person's blood would have cooled at the time the offense was committed, making second degree murder rather than manslaughter the proper verdict. This assignment of error is without merit.
Pro Se Assignment: Violation of La. C. Cr. P. Art. 383
Defendant argues that there was a violation of La. C. Cr. P. Art. 383 when, "upon his request," the clerk of court could not show proof in the form of minutes reflecting that his true bill of indictment was found by no less than nine members of the grand jury.
The record contains an indictment in proper form that was signed by the foreman of the grand jury. However, the minutes of court supplied do not go back to the date of the indictment, 12/03/03. Therefore, the minutes do not show that the indictment was returned in open court, and there is nothing specific in the record to show that it was concurred in by at least nine grand jurors.
*191 Louisiana Code of Criminal Procedure Article 383 states that an indictment must be concurred in by not less than nine of the grand jurors, endorsed "a true bill," and be signed by the foreman. Indictments shall be returned in open court.
The provisions of La. C. Cr. P. Arts. 532 and 533 address general and special grounds, respectively, for a motion to quash. Article 533 specifically addresses the grounds for quashing a grand jury indictment; these grounds include the situation where less than nine grand jurors were present when the indictment was found, and the situation where the indictment was not endorsed "a true bill," or the endorsement was not signed by the foreman of the grand jury.
The provisions of La. C. Cr. P. Art. 535(A) state that a motion to quash may be filed of right at any time before commencement of the trial when based on certain grounds listed in that paragraph, including the ground that the indictment does not conform with the requirements of Chapters One and Two of Title XIII (Indictment Forms and Special Allegations). Section A also provides that the grounds listed in that paragraph may be urged at a later stage of the proceedings in accordance with other provisions of the Criminal Code. Section B of Article 535 states that a motion to quash on the ground that the time limitation for commencement of trial has expired may be filed at any time before commencement of trial. In turn, Section C states that a motion to quash on grounds other than those stated in Paragraphs A and B shall be filed in accordance with Article 521, and Section D states that the grounds for a motion to quash under Sections B and C are waived unless a motion to quash is filed "in conformity with these provisions." Under Article 521, pretrial motions shall be made or filed within 15 days after arraignment, unless a different time is provided by law or fixed by the court at arraignment upon a showing of good cause.
In State v. Sears, 298 So.2d 814 (La. 1974), overruled on other grounds by State v. Lovett, 345 So.2d 1139 (La.1977),[2] the defendant complained that his indictment was substantially defective because it was not endorsed by the foreman of the grand jury. The Louisiana Supreme Court reviewed the Criminal Code articles discussed above and found that, because the ground asserted by the defendant was not found in Section A or B of Article 535, the ground had to be asserted within the time limitations of Section C of Article 535 or it was waived. By waiting until after the verdict to assert the alleged defect, the defendant was held to have waived his complaint. See also State v. White, 404 So.2d 1202 (La.1981).
In the case at bar, as in State v. Sears, supra, the grounds alleged by defendant are not found in Section A or B of Article 535. Thus, they had to be asserted within the time limitations set forth in Section C of Article 535. Because defendant waited until after the trial was over to allege these grounds, he has waived them. This assignment of error is without merit.
Pro Se Assignment of Error: Violation of Rights to Compulsory Process, Due Process and Equal Protection
In this assignment of error, defendant argues that his constitutional rights were violated when his alibi witness, Jennifer Caraway, appeared at the courthouse under subpoena, but was turned away and sent home under the impression that she *192 was not needed. Defendant claims that Ms. Caraway worked at the Arbor House (the place in West Monroe where he was arrested) at the time of the incident, and, because of factors "such as stop signs, traffic lights, and rush hour traffic, it would have been impossible for petitioner to have committed a murder and get to Arbor House . . . in the time frame indicated below . . ." Defendant then goes over what he contends is the correct time line and states that Ms. Caraway's testimony would have shown that it was impossible for him to have arrived at the Arbor House at 5:30 p.m., 42 minutes prior to his arrest and 38 minutes subsequent to the shooting.
The record contains no mention of a Jennifer Caraway, and although there was an on-the-record discussion about Cynthia and Nicola Roy not testifying, there was no mention whatsoever of Ms. Caraway.
An irregularity or error cannot be availed of after the verdict unless it was objected to at the time of its occurrence. La. C. Cr. P. Art. 841; State v. Smith, 39,698 (La.App.2d Cir.06/29/05), 907 So.2d 192; State v. Bosley, 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
This error, which defendant first complains of on appeal, was not objected to at the time of its occurrence. Because it is being raised after the verdict, defendant is precluded from availing himself of it. See La. C. Cr. P. Art. 841. This assignment of error is meritless.

Conclusion
For the reasons set forth above, defendant's conviction and sentence are AFFIRMED.
NOTES
[1] In February 2006, the firm of McKeithen, Ryland & Champagne, which had been enrolled to provide indigent representation to defendant, filed a motion to withdraw, asserting that defendant had filed pro se motions without consulting appointed counsel, had discussed the case with at least three "self-proclaimed inmate counsel" who drafted correspondence contrary to defendant's best interests, and had filed a complaint with the Louisiana Attorney Disciplinary Board against Louis Champagne in which defendant made untrue allegations of unethical conduct and statements of lack of representation. The law firm was allowed to withdraw and Louis Scott was appointed to represent defendant.
[2] State v. Lovett, supra, was superseded by statute/rule as stated in State v. Day, 391 So.2d 1147 (La.1980).