Judgment rendered May 21, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,295-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

DEANGELO WHITAKER                           Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 398,588

Honorable Ramona L. Emanuel, Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Holli Ann Herrle-Castillo

DEANGELO WHITAKER                        Pro Se

JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

REBECCA A. EDWARDS
KODIE K. SMITH
MARGARET E. RICHIE GASKINS
Assistant District Attorneys

* * * * *

Before PITMAN, STONE, and STEPHENS, JJ.

**STEPHENS, J.,**

This criminal appeal arises out of the First Judicial District Court, Parish of Caddo, State of Louisiana, the Honorable Ramona Emanuel, Judge, presiding. The defendant, Deangelo Whitaker, was indicted by a grand jury for the second degree murder of Emanuel Emon King on May 2, 2021, a violation of La. R.S. 14:30.1. A unanimous jury found Whitaker guilty as charged, and he was sentenced to the mandatory term of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. Whitaker has filed the instant appeal. For the reasons set forth below, we affirm Whitaker's conviction and sentence.

## FACTS/PROCEDURAL BACKGROUND

On October 30, 2023, a Caddo Parish grand jury returned an indictment charging Whitaker with the second degree murder of Emanuel Emon King, a violation of La. R.S. 14:30.1. That same day, Whitaker waived arraignment and pled not guilty. On January 31, 2024, an amended indictment was filed charging both Whitaker and Anderito Parnell Smith, Jr., with the second degree murder of King. Pursuant to an "Amended Motion to Sever" filed by the State, the trial court ordered on January 31, 2024, that Whitaker and Smith be tried jointly under the same indictment but that a third defendant, Zykeyland Johnson, be tried alone in a separate trial under a separate indictment. However, both Smith and Johnson pled guilty to manslaughter prior to trial. After a four-day trial held February 26-29, 2024, Whitaker was found guilty as charged by a unanimous jury and sentenced by the trial court to the mandatory term of life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

The following facts were presented at Whitaker's trial.

In May 2021, Kimara Thomas lived in a townhome located at 3784 Richmond Avenue, which is in the Lakeville Townhomes in Shreveport, Louisiana, with her two children and her friend Tyesha Edwards. On May 2, 2021, Kimara and her friends Krishay Critchlow and Kenyatte Metcalf had a party at Kimara's home to cheer up Kimara, who had recently lost twin babies. Kimara's friends got to her home before noon that day.

Anderito Smith and Whitaker arrived at the party together in a black truck. Anderito and Kimara had been in a romantic relationship for less than a year, and Kimara was acquainted with Whitaker through Anderito. Kenyatte knew Whitaker as she had dated one of his friends in 2018. Zykeyland Johnson, a friend of Anderito's and Whitaker's, arrived at the party later. The three men left the party together sometime before 1:00 or 2:00 p.m.

Around that same time, Kenyatte, Kimara, and Tyesha left to go run errands and pick up Krishay, who had been "put out" by her grandmother. They got back to the townhome around 4:00 p.m. Whitaker, Anderito, and Zykeyland came back to Kimara's shortly thereafter. Upon their return, Anderito and Whitaker were seen carrying "big guns," and Zykeyland was observed carrying a smaller gun. Kenyatte saw a shell catcher net attached to Anderito's weapon, but could not recall whether Whitaker's gun had such an attachment. Anderito testified that he and Whitaker were both armed with rifles that had attached shell catchers, while Zykeyland was armed with a handgun.

Shortly after Kenyatte got back to the townhome around 4:00 p.m., her ex-boyfriend Tommy Thompson came to the party and caused a scene. Tommy tried to fight Kenyatte, spoke with Whitaker, threatened to "shoot

2

up" the townhome complex, and then left.  Tommy never returned to the Lakeville Townhomes.

Around 4:45 p.m., the police came to the outside of the townhome complex and made some arrests for possession of edibles and firearms. Kenyatte testified that she did not know any of the persons arrested.  Police officers remained outside the complex until around 7:00 p.m.

Kenyatte had been communicating on Instagram with Rodrecious "Meechie" Lewis, whom she had previously dated in 2020.  Kenyatte had invited Meechie to come to the party and told him he could bring a friend, whose Instagram profile Meechie had shared with her.  Kenyatte did not give Meechie the number of the townhouse or tell him what time he and his friend should arrive.  The reason was because Kenyatte was in a romantic relationship with someone else, and she did not want the two men to accidentally meet.  Kenyatte also wanted to wait until Anderito and Whitaker were gone before Meechie and his friend came over.

When the police had been at the complex making the earlier possession arrests, Kenyatte posted a video of it to Instagram.  Meechie replied to her post, and the two discussed the arrests.  Kenyatte told Meechie that he and his friend could come to the party when "everything is settled." Since Kenyatte felt like things "never did" settle, she never told Meechie to come to the party.  She also never told Whitaker, Anderito, or Zykeyland that she had invited Meechie and his friend to the party "because it wasn't their business."

Throughout the day of May 2, 2021, Meechie had been communicating with his friend Emanuel King about meeting up with Kenyatte and her friends at the party.  Emanuel, his cousin Skyler Hill and

3

friend Logan Watson drove from Vivian in Logan's 2003 black Honda Accord to Blanchard to pick up Meechie so they could ride together to rendezvous with Kenyatte and her female friends in Shreveport.  Meechie was carrying a Colt .45, which he kept concealed.[1]  No one else in the group was armed.  Upon their arrival at the Lakeville Townhomes, which according to Skylar was around 9:00 or 10:00 p.m., they parked in the parking lot, then stood around the car for about five or ten minutes while Meechie and Emanuel text messaged with the girls they were supposed to be meeting.  No one in the group had ever been to those apartments before.  They saw flashing lights coming from inside of one of the townhomes, and Meechie told them that was the party's location.  Emanuel walked up to the front door of the townhouse alone while Meechie, Skyler, and Logan remained near the car.

Inside the townhouse, Zykeyland was standing by the window looking out through broken blinds.  He told the other men inside that there were some men standing around a car.  Zykeyland, Anderito, and Whitaker then left the townhome through the back door to check out who the men in the parking lot were.  Kimara stated that as the men exited, Whitaker and Anderito were armed with rifles, while Zykeyland was armed with a handgun.

Approximately two minutes after the men walked out the back door, Emanuel came in the townhouse through its front door.  This was about the time when gunshots started going off outside the apartment.  At that time,

---

[1] Meechie also gave Emanuel a "Three Babies" jacket to wear to the party.  Logan acknowledged that "Three Babies" is a gang in Shreveport, but testified that they are "just country boys" from Vivian who knew of "them" but weren't part of "them."

Kenyatte was dancing on a stripper pole, Krishay was standing by the stairs waiting for her turn to dance on the stripper pole, and Kimara was sitting on the bottom step of the staircase. Emanuel remained near the front door after shutting it behind himself. Krishay and Kimara asked Emanuel who he was and why he was there. His response was that he had been invited there by a girl. Kenyatte, who did not initially recognize Emanuel from the Instagram page photo Meechie had previously sent to her, could not hear Emanuel's response over the music and had walked over to him to find out what was going on. It was dark inside the townhome except for flashing lights on the stripper pole and a stove light on in the kitchen near the back door. Kenyatte was able to see that Emanuel was not armed and had nothing in his hands.

Skylar testified that gunshots outside were fired at him, Logan, and Meechie who were still in the parking lot outside the townhouse. Skyler had seen a guy dressed in all black walking "like he had a gun on him." Skylar told Logan and Meechie to "watch out." Logan recalled hearing shots fired by more than one gun, but because it was dark, he couldn't see who was shooting at them. Meechie was hit by one of the gunshots. Skyler, Logan, and Meechie took off running away from Logan's vehicle. Meechie and Skyler ran in the same direction, and Logan ran off in another direction. Skylar stated that he didn't think Meechie even pulled out his gun.

After the shooting stopped, Meechie called his sister to come pick up him and Skyler. He then called Logan and told him to go back and get his car. Logan waited to be sure the shooters were gone before returning to the townhouses. Logan's car had been shot up. Someone from the townhouses who was standing in the parking lot told him that he needed to "get the 'f' on—if we ever see you again we will kill you." Logan testified that all he

5

could remember about the man was that he had "gold in his mouth." Because his phone had died, he jumped in his car to charge it and drove it somewhere he felt safe, close to downtown, and called a family member.

When Emanuel heard the shots, he locked the door of the townhouse. Kimara got down on the ground in front of the stairs, Kenyatte ran up the stairs and sheltered in the upstairs hallway, and Krishay got halfway up the stairs before freezing in place. Whitaker, Anderito, and Zykeyland were not inside the townhome when the shots were being fired, and the music in the townhome had stopped when the shooting began.

After the shooting was over, Whitaker, Anderito, and Zykeyland came back into the townhouse through the back door. Kimara testified that the stove light was positioned so that the face of anyone entering through that door was clearly visible. Both Krishay, who was still standing halfway up the stairs, and Kimara said that the three men were in possession of their weapons when they came back into the house. Krishay ran upstairs as the men confronted Emanuel.

Kenyatte heard Anderito ask Emanuel who he was and who he was looking for, then heard Whitaker ask him the same questions. Kimara, who was still downstairs, tried to de-escalate the situation and calm down the three men by asking Emanuel who he was and why he was there. She heard Emanuel say that a girl had invited him to a party at the townhome. Kenyatte then heard Kimara tell her boyfriend Anderito, "no, don't do it."

Kenyatte and Krishay, who were together upstairs, heard shots coming from downstairs. Kimara later testified that she had begun walking away from Emanuel and had her back towards him when the shooting began. Kimara ran upstairs to check on her children. As the shots continued to ring

out, Krishay, Kenyatte, Kimara, and Kimara's children stayed upstairs. Krishay and Kimara described their location as an upstairs "room," but Kenyatte was adamant that they were all sheltered in the windowless upstairs hallway so as to avoid being hit by any bullets that could have gone through a window. Krishay stated that she was able to see the gun flashes.

After the shots ended, Kenyatte grabbed Krishay's phone to call 911, but Krishay snatched her phone back. Krishay and Kimara went back downstairs while Kenyatte stayed upstairs before joining them. They found that the music was off, the townhouse was dark, and Whitaker, Anderito, and Zykeyland were gone. All three women testified that they did not see Emanuel's body on the floor because of the darkness. Kenyatte testified that before they left the townhome, Kimara received a phone call from either Whitaker or Anderito, and she heard Kimara tell whoever called that "this boy is dying on my floor."

The women and Kimara's children left the townhouse together in Kimara's vehicle. There was not a black truck in the parking lot when they left. Kimara was still on the phone with the man as they were leaving. From what Kenyatte overheard of the conversation, the man on the phone was trying to convince Kimara to come meet up with him and bring Kenyatte with her. Kenyatte at that point did not trust anyone, including Kimara, and demanded to go home. Krishay and Kimara dropped Kenyatte off at her home, then they and the children went to a hotel.[2] When she got

---

[2] Neither Krishay nor Kimara attempted to call 911 to report the shooting, at that time or subsequently.

home, Kenyatte told her mother what had occurred, but her mother didn't believe her at first. Kenyatte called 911 to report the shooting.

Around 10:20 p.m. on May 2, 2021, Shreveport Police Department ("SPD") Corporal Jalisa Lafitte was on patrol when she was dispatched to the Lakeville Townhomes area to investigate a reported vandalism. Once there, the caller, a resident of 3742 Richmond Avenue, told Cpl. Lafitte that her unit had been struck by gunfire earlier that evening. Cpl. Lafitte observed damage to the front and inside of 3742 Richmond Avenue and to a vehicle parked directly in front of the residence, which would have come from the opposite side of the parking lot, which is where 3784 Richmond Avenue is located.

Cpl. Lafitte received a follow-up call from dispatch informing her that a shooting had occurred inside 3784 Richmond Avenue. Cpl. Lafitte and another SPD officer opened the front door of that residence to find Emanuel King's body lying near the doorway. Cpl. Lafitte noticed that King had multiple gunshot wounds and was already deceased. There were spent and unspent shell casings inside the residence and spent shell casings outside in the parking lot. All of them were .223 caliber except for one .45 caliber spent casing found inside the apartment.[3]

SPD Corporal Adam McEntee was the Violent Crimes Unit detective assigned to this case. On May 2, 2021, Cpl. Lafitte informed Cpl. McEntee that a witness had called the Bossier City Police Department ("BCPD") to report the murder. BCPD Sgt. Brown reported that Kenyatte Metcalf was

---

[3] Subsequent to Whitaker's arrest, a .556 rifle magazine was recovered from the glove box of a black Dodge Ram truck towed from the defendant's home to a secure police bay.

the witness; Kenyatte was interviewed by Cpl. McEntee three times—her statements were consistent with each other and with her testimony at trial.[4] In her second interview, Kenyatte related that Whitaker and Anderito Smith arrived to the party in a large black truck that was spray painted.

Det. McEntee also spoke with Skyler Hill and Logan Watson about what they had witnessed; their statements were consistent.[5] Logan's Honda Accord was located near the crime scene. It was processed by CSU Sgt. White, who documented nine bullet holes and a number of other defects in the vehicle's exterior. Cpl. McEntee, acting upon information received from the BCPD, located Bossier City addresses for Whitaker and Anderito Smith. Cpl. McEntee went to Whitaker's address and saw a black Dodge dually truck matching the description of the truck previously given by Kenyatte. Sgt. White processed the truck and retrieved a .556 caliber rifle magazine from the glove compartment. Sgt. White noted there was no gunfire damage to the truck.

Det. McEntee testified that Whitaker was arrested on May 6, 2021, by the BCPD for possession of stolen things[6] and was subsequently charged with one count of second degree murder for the death of the victim, Emanuel King. About a month later, Anderito Smith was arrested in Los Angeles,

---

[4] Det. McEntee also interviewed other witnesses to King's shooting. Krishay Critchlow initially refused to provide any details about the shooting, but once she decided to cooperate, her statement was consistent with those made by Kenyatte. Kimara Thomas was not truthful initially about what she saw and heard the night of the shooting. At trial, however, she contends that her testimony was completely truthful. As of the time of trial, Kimara had been charged with failing to report the shooting.

[5] Det. McEntee also spoke with Meechie, who declined to come in for an interview.

[6] Defense counsel objected to this testimony as improper other crimes evidence, but because the objection wasn't made during the detective's direct testimony, it could not be properly overruled, and the trial judge declined to strike the testimony from the record.

California, by U.S. Marshals, and five months later Zykeyland Johnson was arrested in DeSoto Parish, Louisiana.

Phillip Stout, the firearms section supervisor at the North Louisiana Crime Lab, testified that both .556 and .223 caliber rounds can be fired from an AR rifle. Of the four .556 fired cartridge casings he was asked to analyze, three were fired from the same weapon, and the other one was too damaged to analyze. According to Stout, the damaged one was a different brand than the other three, and there is a possibility that it was fired from the same weapon. The .45 caliber casing Stout analyzed was consistent with having been fired from a handgun; specifically, the particular case is commonly associated with a Glock pistol.

Dr. James Traylor, the forensic pathologist who performed the autopsy on the victim, Emanuel King, testified that the victim sustained four gunshots, two of which penetrated his body. Dr. Traylor opined that, based on the nature of one of Emanuel's injuries, including a fragmented laceration of his left hip and pelvis area, it was consistent with having been caused by a high-powered rifle, not a handgun. Likewise, the size and nature of the exit wound caused by another bullet was also consistent with having been caused by a high-powered rifle rather than a handgun.

Anderito Smith testified for the defense at Whitaker's trial. According to Anderito, Whitaker did not shoot and kill Emanuel King. However, Anderito acknowledged that Whitaker was armed with a rifle outfitted with a shell catcher when they went out the back door of Kimara's townhouse prior to shots being fired in the parking lot that night, when reentering the townhome through that same back door, and when King was shot. A unanimous jury found Whitaker guilty as charged of second degree murder

on February 29, 2024. On March 12, 2024, Whitaker filed motions for new trial and post-verdict judgment of acquittal, both of which were denied in open court. On the same date, the trial court sentenced Whitaker to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, the mandatory sentence to be imposed upon a conviction of second degree murder. The instant appeal followed.

## DISCUSSION

### *Sufficiency of the Evidence*

According to appellate counsel, the State failed to present any evidence that Whitaker was either one of the shooters or a principal to the shooting of the victim, Emanuel King. In order to convict Whitaker of second degree murder, the State had to prove beyond a reasonable doubt that he killed the victim and he had the specific intent to kill or inflict great bodily harm.

Appellate counsel points out that none of the witnesses who testified for the State observed the shooting inside the apartment. The only witness who did observe the actual shooting was Anderito Smith, who testified that Whitaker did not shoot King. There were no firearms recovered to compare to the spent casings or bullets retrieved. Only three of the spent casings were shot by the same weapon, and no conclusions could be drawn as to the other casings or bullet.

Appellate counsel further asserts that the State offered no proof that Whitaker shot the victim. Likewise, the State failed to introduce any evidence that Whitaker aided or abetted in the commission of the offense, or directly or indirectly counseled or procured the other two men to commit the crime. There was no evidence as to who fired the shots outside of the

11

townhouse—no identifications could be made by the witnesses, and the people who identified Whitaker as being inside the townhouse did not see anything that happened outside of it.

According to defense counsel, Whitaker's presence in the townhome at the time of the shooting, and his possession of a weapon, does not prove he was a shooter, particularly in light of guilty pleas to manslaughter by both Anderito Smith and Zykeyland Johnson and Anderito's testimony that Whitaker did not shoot King.

Ammunition recovered from the scene was consistent with a high-powered rifle. Both Whitaker and Anderito were alleged to have been in possession of "big" guns that night. Anderito pled guilty to the shooting and testified that Whitaker did not shoot King. The ammunition links to Anderito based on his testimony and that of the other witnesses, urges appellate counsel.

It is appellate counsel's position that the only direct evidence exonerates Whitaker. The other evidence presented by the State was circumstantial. The State failed to exclude at least one reasonable hypothesis of innocence, that the shooting of King occurred as Anderito Smith testified, that he and Zykeyland Johnson were the shooters. Likewise, the State failed to establish that Whitaker was a shooter or principal to the shooting. Therefore, the evidence was insufficient to establish the necessary elements to prove Whitaker's guilt of second degree murder beyond a reasonable doubt, and his conviction and sentence must be reversed.

On the other hand, the State points out that the jury weighed two days of evidence, which consisted of testimony from 12 witnesses and numerous photographs and physical evidence (shell casings) before finding Whitaker

12

guilty of second degree murder. Circumstantial evidence, together with the testimony of Krishay Crichlow, Kimara Thomas, Kenyatte Metcalf, and Anderito Smith overwhelmingly established that Whitaker was an active participant in the shooting of the victim, Emanuel King.

The State notes that Krishay and Kimara testified that at the time of the parking lot shooting and King's shooting, they saw both Whitaker and Anderito armed with large rifles. Anderito also testified that both he and Whitaker were armed with rifles equipped with shell catchers. Firearms expert Philip Stout testified that three of the .556 caliber rifle cartridges recovered at the scene were fired by the same rifle. Stout further testified that if a shell catcher is attached to a rifle, it can prevent the majority of the rifle's shell casings from being left behind at a crime scene. Dr. James Traylor testified that the wounds on Emanuel's body were made by a rifle, not a handgun.

The State admits that it was unable to prove whether Anderito or Whitaker fired the fatal shot at Emanuel because they both used shell catchers; no firearms were recovered in this case; and Anderito testified that Whitaker did not shoot at and therefore kill Emanuel. According to the State, however, the jury could have disregarded that part of Anderito's testimony as not credible and concluded instead that Whitaker also fired his rifle at Emanuel. Nonetheless, even if the jury accepted Anderito's testimony as true and found that Whitaker did not fire his rifle at Emanuel, it could have concluded that Whitaker is guilty of second degree murder as a principal.

The evidence presented at trial showed that Whitaker, armed with a rifle, ran outside with Anderito and Zykeyland prior to the shooting. Even if

13

all of the shots fired in the parking lot were from Anderito's rifle, Whitaker saw and understood that it was Anderito's intent to shoot the men who had come to the party. At the very least, Whitaker stood by in the parking lot, armed with his own rifle, ready to give Anderito help if needed. Knowing Anderito intended to shoot the men who had come to the party at Kimara's house, Whitaker, still with his rifle in hand, went back into the townhome with his friend to confront Emanuel King.

From where she was in the upstairs hall, Kenyatte heard both Anderito and Whitaker ask Emanuel who he was and who he was looking for just prior to the shooting. If it was Anderito who fired all of the fatal shots at Emanuel, Whitaker stood by during the shooting, armed with his own rifle, "ready to give aid if necessary." The State asserts that these were acts of participation, not mere presence. While the State could not prove which man actually shot Emanuel, it did not have to. What it did was prove beyond a reasonable doubt that Whitaker was aware of Anderito's intentions and was there to assist him in carrying them out, thus making Whitaker a principal to the murder of Emanuel King.

Under the due process standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, 443 U.S. at 319, 99 S. Ct. at 2789; *State v. Stockstill*, 19-01235, p. 4 (La. 10/20/20), 341 So. 3d 502, 505-06. This standard, now codified in La. C. Cr. P. art. 821, does not afford an appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

14

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Instead, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, and 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed. 2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Coffey*, 54,729 (La. App. 2 Cir. 9/21/22), 349 So. 3d 647, *writ denied*, 22-01574 (La. 12/20/22), 352 So. 3d 89; *State v. Wilson*, 50,418 (La. App. 2 Cir. 4/6/16), 189 So. 3d 513, *writ denied*, 16-0793 (La. 4/13/17), 218 So. 3d 629.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). La. R.S. 14:24 provides that all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). An individual may be convicted only for those crimes for which he personally has the requisite intent. It is not enough that his accomplice have the intent,

the State must prove that the defendant had the required mental element. *Id.*, 01-1658, pp. 7-8, 851 So. 2d at 930; *State v. Brooks*, 505 So. 2d 714, 717 (La. 1987), *cert. denied*, 484 U.S. 947, 108 S. Ct. 337, 98 L. Ed. 2d 363 (1987); *State v. Holmes*, 388 So. 2d 722, 726 (La. 1980).

Specific intent is a state of mind that may be inferred from the circumstances of the transaction and the actions of the accused. *State v. Tate*, *supra*; *State v. Brooks*, *supra*. To establish specific intent, the State must show that the defendant pulled the trigger, acted in concert with his co-perpetrators, or actively acquiesced in the use of deadly force. *State v. Tate*, *supra*; *State v. Anthony*, 98-0406 (La. 4/11/00), 776 So. 2d 376, *cert, denied*, 531 U.S. 934, 121 S. Ct. 320, 148 L. Ed. 2d 258 (2000); *State v. Brooks*, *supra*. Acting in concert, each person becomes responsible not only for his own acts, but for the acts of the others. *State v. Anderson*, 97-1301 (La. 2/6/98), 707 So. 2d 1223; *State v. Frost*, 53,312 (La. App. 2 Cir. 3/4/20), 293 So. 3d 708, *writ denied*, 20-00628 (La. 11/18/20), 304 So. 3d 416; *State v. Jones*, 49,830 (La. App. 2 Cir. 5/20/15), 166 So. 3d 406. As noted above, under the law of principals, a person may be convicted of an offense even if he has not personally fired the fatal shot. *Id.*

The evidence presented at trial by the State established that Whitaker had the requisite intent to be convicted as a principal of second degree murder. The defendant was not just present at the scene. He was inside the apartment, holding a rifle, involved in the confrontation of Emanuel King, after having been outside, doing the same thing to Emanuel's three friends. Even if Whitaker did not fire his weapon, the evidence established beyond a reasonable doubt that he intended for Emanuel to be shot. Whitaker knew that Anderito intended to shoot the men who came to the party—Anderito

16

had already shot at the three men outside. Knowing this, Whitaker "at the very least" stood with his friend, armed and ready to assist while Anderito shot Emanuel. The jury could have found that Whitaker intended that Emanuel be killed or sustain great bodily harm both from his participation in the confrontation and his failure to intervene and stop Anderito from shooting Emanuel. Based on the evidence presented at trial, the jury could have reasonably found that Whitaker was guilty as a principal to second degree murder. This assignment of error is without merit.

## *Assignments of Error Raised by Defendant in Pro Se Brief*

### The trial court failed to complete the trial court transcript and due process violation

Whitaker claims that he was denied the right to an effective appeal, citing La. Const. art. I, § 19. According to the defendant, "the trial transcript remains only 50% complete, obstructing review of jury selection procedures, pretrial motions, and jury instructions." We note that per the court reporter's certification on R. p. 126, the only thing not transcribed was the jury *voir dire*.[7] However, it was not transcribed because it was not requested in the "Motion for Appeal and Designation of Record" filed by defendant's attorney on March 16, 2024. This assignment of error is without merit.

### Unconstitutionally suggestive identification

Whitaker next asserts that the only identification linking him to the offense was a single photo lineup, which was inherently suggestive. He

---

[7] Apparently the court reporter in this case had trouble timely completing the trial court transcript; there were several requests for an extension filed, including the "Motion and Order for Extension of Return Date" filed with this Court on October 4, 2024, attached to Whitaker's *pro se* brief as **Exhibit A**. This fourth request was denied by the Court, but the previous ones had been granted. Nonetheless, the reporter was able to complete transcribing the requested sections as evidenced by the certificate (which was confirmed by this Court's review of the entire record).

cites U.S. Const. Amendments 13 and 14 and La. Const. art. I, § 3. This issue was the subject of a pretrial *pro se* motion to suppress adopted and argued by Whitaker's defense counsel at a brief hearing held on the first morning of trial. The trial court heard arguments from both defense counsel and the State's attorney and testimony from Cpl. Adam McEntee. Specifically, Cpl. McEntee related that one-person photo arrays were used when a subject was known by a witness or person, such as in the instant case, where the identifying person, Krishay Crichlow, knew the defendant, having previously been in a relationship with him. The motion to suppress was denied by the trial court.

During Krishay's testimony at trial, the State's attorney asked her about the identification of Whitaker during her statement to police. Defense counsel renewed her objection, which was overruled. Krishay was shown the photo, which she identified as the defendant, "D-Lo" Whitaker, that she signed and dated when she spoke with police on May 7, 2021. She related to the jury that she had known Whitaker "a couple months" before the shooting, having been introduced to him by her friend Kimara.

A defendant seeking to suppress an identification must prove both that the identification itself was suggestive, and that there was a likelihood of misidentification as a result of the identification procedure. *State v. Crossley*, 48,149, p. 15 (La. App. 2 Cir. 6/26/13), 117 So. 3d 585, 596, *writ denied*, 13-1798 (La. 2/4/14), 132 So. 3d 410. An identification procedure is unduly suggestive if, during the procedure, the witness's attention is unduly focused on the defendant. *Id.*

For this reason, identifications arising from single-photo displays ***may be*** viewed with suspicion. *State v. Sparks*, 88-0017 (La. 5/11/11), 68 So. 3d

18

435, *cert. denied*, 566 U.S. 908, 132 S. Ct. 1794, 182 L. Ed. 2d 621 (2012). However, their suggestive nature will not *per se* preclude admissibility unless found to be untrustworthy under the total circumstances of the particular case under consideration. *State v. Crossley*, 48,149, p. 15, 117 So. 3d at 596.

Instead, fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State v. Bell*, 51,312 (La. App. 2 Cir. 5/17/17), 222 So. 3d 79. To prove a violation of due process, a defendant must first show that the identification procedure was unnecessarily suggestive and, second, that there was a substantial likelihood of misidentification. Admitting evidence of a suggestive identification procedure does not violate due process if the identification is reliable. *Id.*; *State v. Womack*, 47,639 (La. App. 2 Cir. 1/16/13), 109 So. 3d 418, *writ denied*, 13-0304 (La. 9/20/13), 123 So. 3d 163.

In the instant case, there was no substantial likelihood of misidentification, and the trial court did not err admitting the photo into evidence based upon its finding that Krishay's identification of Whitaker was reliable. Krishay knew the defendant, having been in a relationship with him after being introduced to him by a mutual friend. Courts in Louisiana have routinely upheld one-photograph identifications in cases in which the identifying witness or victim was familiar with the accused. Krishay's identification can in no way be compared with the usual identification process in which a witness sees a stranger commit an offense

19

and is then asked to identify the perpetrator.[8]  This assignment of error is without merit.

**Ineffective assistance of counsel**

According to Whitaker, his trial counsel was ineffective because he did not file a motion to suppress the unreliable identification; did not object to the racially imbalanced jury selection process; did not challenge the unsigned indictment, which deprived the court of jurisdiction; and did not ensure proper jury instructions.

Both the U.S. and Louisiana constitutions guarantee a criminal defendant's right to the effective assistance of counsel.  U.S. Const. Amend. VI; La. Const. art. I, § 13; *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *State v. Brooks*, 94-2438 (La. 10/16/95), 661 So. 2d 1333; *State v. Bayles*, 53,696 (La. App. 2 Cir. 11/17/21), 329 So. 3d 1149.  A claim of ineffective assistance of counsel is analyzed under the two-prong test set forth by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To establish that his attorney was ineffective, a defendant must show that counsel's performance was deficient, and that this deficiency prejudiced his defense.  *State v. James*, 55,866 (La. App. 2 Cir. 11/20/24), 400 So. 3d 1263; *State v. Hilliard*, 52,652 (La. App. 2 Cir. 8/14/19), 278 So. 3d 1065, *writ denied*, 19-01701 (La. 7/24/20), 299 So. 3d 68.  The defendant must

---

[8] *See*, *State v. Crossley*, *supra* (not a suggestive identification procedure, no likelihood of misidentification—victim identified her assailant by name (Crossley) to the questioning officer, having known him from when Crossley dated her mother); *State v. Peters*, 10-0326 (La. App. 2 Cir. 2/16/11), 60 So. 3d 672, *writ denied*, 11-0494 (La. 9/30/11), 71 So. 3d 279 (reliable identification, thus admissible because no likelihood of misidentification—the victim knew her assailant because she lived two houses down from the defendant/assailant for many years); and *State v. Salone*, 93-1635 (La. App. 4 Cir. 12/28/94), 648 So. 2d 494 (reliable identification, no substantial likelihood of misidentification—the victim was defendant's former employer).

show that, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*, *supra*; *State v. Fields*, 55,448 (La. App. 2 Cir. 1/10/24), 379 So. 3d 244; *State v. Bell*, *supra*.

In the instant case, Whitaker has not set forth any facts in support of any of his allegations. As such, his claim of ineffective assistance of counsel will be more appropriately addressed in an application for post-conviction relief in the trial court, where a full evidentiary hearing can be conducted, rather than on direct appeal, since the instant record does not contain sufficient evidence for this Court to rule on the merits of such a claim. *See*, *State v. LaCaze*, 99-0584 (La. 1/25/02), 824 So. 2d 1063, 1079, *cert. denied*, 537 U.S. 865, 123 S. Ct. 263, 154 L. Ed. 2d 110 (2002); *State v. Deruise*, 98-0541 (La. 4/3/01), 802 So. 2d 1224, 1248, *cert. denied*, 534 U.S. 926, 122 S. Ct. 283, 151 L. Ed. 2d 208 (2001); *State v. Cannon*, 55,708 (La. App. 2 Cir. 10/2/24), 399 So. 3d 853. This assignment of error is without merit.

**Invalid indictment for lack of grand jury signature**

Whitaker claims that his indictment is invalid because it was not signed by the foreman. *See*, *State v. Vincent*, 387 So. 2d 1097 (La. 1980). Without a valid indictment, the trial court lacked jurisdiction over him, and his conviction is void.

Under Louisiana law, prosecution for a capital offense or an offense punishable by life imprisonment shall be instituted by indictment by the grand jury, and prosecution of other felony offenses shall be initiated by indictment or information. La. Const. art. I, § 15; La. C. Cr. P. art. 382(A). An indictment is a written accusation of crime made by a grand jury that must be concurred in by not less than nine grand jurors, indorsed a "true

21

bill," and the indorsement must be signed by the foreman. An indictment must be returned in open court. La. C. Cr. P. art. 383; *State v. Brazell*, 17-0032 (La. App. 4 Cir. 4/18/18), 245 So. 3d 15, *writ denied*, 18-0868 (La. 3/6/19), 266 So. 3d 900, *cert. denied*, ─── U.S. ───, 140 S. Ct. 263, 205 L. Ed. 2d 167 (2019).

The time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. *State v. Draughn*, 05-1825 (La.1/17/07), 950 So. 2d 583, *cert. denied*, 552 U.S. 1012, 128 S. Ct. 537, 169 L. Ed. 2d 377 (2007); *State v. Frost*, *supra*; *State v. Jones*, 49,948 (La. App. 2 Cir. 9/30/15), 178 So. 3d 1075. A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. *Id.*; *State v. Cavazos*, 610 So. 2d 127 (La. 1992); *State v. Singleton*, 52,151 (La. App. 2 Cir. 1/16/19), 263 So. 3d 1269, *writ denied*, 19-00457 (La. 1/22/20), 291 So. 3d 1039; *State v. Scheanette*, 51,851 (La. App. 2 Cir. 2/28/18), 246 So. 3d 718.

When an accused has been fairly informed of the charge against him by the indictment and has not been prejudiced by surprise or lack of notice, technical sufficiency of the indictment may not be questioned after conviction where no objection was raised to it prior to the verdict. *State v. Jones*, *supra*; *State v. T.T.*, 12-0146 (La. App. 1 Cir. 9/21/12), 111 So. 3d 71, *writ denied*, 12-2617 (La. 5/17/13), 117 So. 3d 509.

In the instant matter, neither the original nor the amending indictment contains the signature of the grand jury foreperson, which is Whitaker's

22

complaint on appeal. However, there is no indication in the record that Whitaker objected to the sufficiency of the indictment prior to trial.

La. C. Cr. P. art. 532 sets forth special grounds for quashing a grand jury indictment, which include the situation where the indictment was not signed by the grand jury foreperson. *See* La. C. Cr. P. art. 533(5); *State v. Mack*, 43,206, p. 12 (La. App. 2 Cir. 4/23/08), 981 So. 2d 185, 191, *writ denied*, 08-1222 (La. 2/20/09), 1 So. 3d 491. In *State v. Mack*, the defendant complained on appeal that his indictment was not in proper form because there was no proof that his indictment was concurred in by "not less than nine grand jurors," which, if true, constituted a violation of La. C. Cr. P. art. 533(4). *Id.*

The Court in *State v. Mack*, *supra*, then analyzed article 535, which provides the time within a motion to quash must be filed:

> The provisions of La. C. Cr. P. art. 535(A) state that a motion to quash may be filed of right at any time before commencement of the trial when based on certain grounds listed in that paragraph, including the ground that the indictment does not conform with the requirements of Chapters One and Two of Title XIII (Indictment Forms and Special Allegations). Section A also provides that the grounds listed in that paragraph may be urged at a later stage of the proceedings in accordance with other provisions of the Criminal Code. Section (B) of article 535 states that a motion to quash on the ground that the time limitation for the commencement of trial. In turn, Section (C) states that a motion to quash on grounds other than those stated in Paragraphs (A) and (B) shall be filed in accordance with article 521, and Section (D) states that the grounds for a motion to quash under Sections (B) and (C) are waived unless a motion to quash is filed "in conformity with these provisions." Under article 521, pretrial motions shall be made or filed within 15 days after arraignment, unless a different time is provided by law or fixed by the court at arraignment upon a showing of good cause.
>
> In *State v. Sears*, 298 So. 2d 814 (La. 1974), *overruled on other grounds by State v. Lovett*, 345 So. 2d 1139 (La. 1977), *superseded by statute/rule as stated in State v. Day*, 391 So. 2d 1147 (La. 1980), **the defendant complained that his**

**indictment was substantially defective because it was not endorsed by the foreman of the grand jury**. The Louisiana Supreme Court reviewed the Criminal Code articles discussed above and found that, **because the ground asserted by the defendant was not found in Section (A) or (B) of article 535, the ground had to be asserted within the time limitations of Section (C) of article 535** (pursuant to C. Cr. P. art. 521, i.e., within 15 days after arraignment, unless a different time is provided by law or fixed by the court at arraignment upon a showing of good cause) or it was waived. **By waiting until after the verdict to assert the alleged defect, the defendant was held to have waived his complaint**. *See also State v. White*, 404 So. 2d 1202 (La. 1981).

*Id.*, 43,206 at pp. 13-14, 981 So. 2d at 191. (emphasis added).

The Court in *State v. Mack* then found that **the grounds alleged by the defendant**, as in *State v. Sears*, *supra*, **were not found in La. C. Cr. P. art. 535(A) or (B)**. Therefore, **they were required to have been asserted within the time limitations set forth in Section (C) of article 535**. **Because the defendant first alleged the grounds after trial, he waived them**. *See*, State *v. Mack*, 43,206, p. 14, 981 So. 2d at 191.

The complaint raised by Whitaker in this case is identical to that of the defendant in *State v. Sears*, *supra*, and comparable to that of the defendant in *State v. Mack*, *supra*. Whitaker's claim is not within La. C. Cr. P. art. 535(A) or (B); therefore, it was required to have been asserted via a motion to quash in conformity with art. 535(C) and (D). Inasmuch as Whitaker did not raise his claim in a timely manner pretrial, he has waived his right to complain of the absence of the foreperson's signature. This assignment of error is without merit.

**Deficient jury instructions**

According to the defendant, the trial court erred in failing to instruct the jury properly. Specifically, the trial court: failed to define reasonable doubt; failed to instruct the jury re: lesser included offenses; and, failed to

24

explain identification reliability issues to caution jurors about suggestive evidence. Whitaker claims that each of these omissions was structural error requiring reversal.

La. C. Cr. P. art. 802 provides in part that the court shall charge the jury as to the law applicable to the case.

La. C. Cr. P. art. 804(A) provides:

In all cases the court shall charge the jury that:

(1) A person accused of a crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt;

(2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case; and

(3) It is the duty of the jury if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.

The court *may*, but is not required to, define … "reasonable doubt" or give any other or further charge upon the same than that contained in this article.

La. C. Cr. P. art. 803 provides that when a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense.

First, the record does not contain any objections to the jury instructions given by the trial court, before or during trial. As noted by this Court in *State v. Noyes*, 55,774, p. 10 (La. App. 2 Cir. 8/28/24), 399 So. 3d 694, 701, *writ denied*, 24-01178 (La. 12/27/24), 397 So. 3d 1216, a defendant's failure to object to the trial court's jury instructions

25

contemporaneously precludes him from complaining of alleged errors in the instructions on appeal. La. C. Cr. P. art. 841(A); *State v. Williams*, 55,537, p. 8 (La. App. 2 Cir. 2/28/24), 381 So. 3d 287, 294, *writ denied*, 24-00393 (La. 11/27/24), 396 So. 3d 253; *State v. Sandifer*, 16-0842, p. 5 (La. App. 4 Cir. 6/27/18), 249 So. 3d 142, 149, *writs denied*, 18-1316, 18-1261,18-1310 (La. 3/25/19), 267 So. 3d 593, 599, 600. Nonetheless, we note that the trial judge did in fact give the jury instructions defining reasonable doubt[9] and listing and explaining second degree murder and the lesser included offenses. This assignment of error is without merit.

**Cumulative error depriving Whitaker of a fair trial**

Finally, the defendant claims that even if individual errors do not warrant reversal of his conviction and sentence, together their effect undermined the fairness of his trial and "the accumulation of constitutional violations requires reversal and remand for a new trial." Based on the above, this assignment of error has no merit.

## CONCLUSION

For the reasons set forth above, the defendant Deangelo Whitaker's conviction and sentence are AFFIRMED.

**AFFIRMED.**

---

[9] Specifically, the trial judge instructed the jury that, "[r]easonable doubt is doubt, based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge [against the defendant]."